654 A.2d 587

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Charles AVONDET.**

Superior Court of Pennsylvania.

Submitted Dec. 12, 1994.

Filed Feb. 14, 1995.

J. Karen Arnold, Asst. Dist. Atty., Bellefonte, for Commonwealth, appellant.

Joseph L. Amendola, State College, for appellee.

Before WIEAND, HUDOCK and HESTER, JJ.

HESTER, Judge:

This is a Commonwealth appeal[1] from the May 17, 1994 order suppressing certain statements made by appellee at the time of his arrest. We reverse and remand.

Initially, we examine the relevant standard of review:

[W]hen reviewing the Commonwealth's appeal from the decision of a suppression court, we must consider only the evidence of the defendant's witnesses and so much of the evidence for the prosecution as read in the context of the record as a whole remains uncontradicted. *Commonwealth v. Elliot,* 416 Pa.Super. 499, 611 A.2d 727 (1992). When the evidence supports the trial court's findings of fact, we are bound by such findings, and this Court may reverse only when the legal conclusions drawn from these facts are erroneous. *Id.*

*Commonwealth v. Baer,* 439 Pa.Super. 437, 654 A.2d 1058 (1994).

The uncontradicted evidence of the sole witness at the March 4, 1994 suppression hearing, Pennsylvania State Police Trooper Robert Snook, was as follows. On November 17, 1993, police received a call that J.S. had been raped by appellee, Charles Avondet, who is her step-grandfather. Offi-

---

1. In accordance with the requirements of *Commonwealth v. Dugger,* 506 Pa. 537, 486 A.2d 382 (1985), the Commonwealth has certified that the suppression order substantially handicaps its prosecution of this case. Appellant's brief at 7.

cer Snook and another officer interviewed the victim at the hospital, and as a result, Officer Snook obtained both an arrest warrant and a search warrant. They executed the warrant immediately, arriving at appellee's residence at 4:15 a.m. Officer Snook described what occurred at that point:

.... We had knocked on the door and he came out. We identified ourselves. He seemed rather shocked. Told him why we were there and the first thing out of his mouth was, well, I didn't rape her. You know, she voluntarily come back and had sex with me. He says, I can't believe this.

Notes of Testimony, 3/4/94, at 7. At that point, appellee became ill, started to breathe rapidly, and fell over. The police carried him to a chair in the kitchen and decided not to arrest him. Officer Snook called appellee's daughter, and she came over to assist him. Once appellee recovered, police read him his *Miranda* rights, and appellee then made a second statement, in conformity with his first statement, in which he indicated that he and the victim had had consensual intercourse.

Thus, the sequence of events is clear. As soon as the police informed appellee that he was being arrested for rape, he became highly agitated and ill and insisted that the sex had been consensual. Officer Snook never deviated from this description of events and in fact, repeated it:

Q Now, with respect to the initial statements that the defendant, Mr. Avondet, made when you first arrived, you said he acted shocked or seemed shocked. Can you be more specific as to how, what led you to the conclusion that he was acting shocked?

A It was just a surprise look on his face and like no, no, no, no. He says I didn't rape her. He said, you know, we had sex, yeah, but ...

Q All right so the initial statements are just basically blurt-out type statement?

A Yes.

Q You're not asking him questions at that point?

A No.

Q   Okay.   Now, after he falls and you get his, call his daughter and ask her to come over and you said he was talking to you about it.   Did you at any point give his Miranda rights?

A   Yes.   It was 0425 hours and he did·sign the common state police rights and waiver.

Q   In terms of when he signed the Miranda, did you actually read him the Miranda rights?

A   Yes.

Q   In terms of when that occurred in relation to the overall time frame, like what time you got there, then he falls, then they make the call to the daughter, where did the Miranda rights advice come in and that whole scenario?

A   I'm not positive.   It was just before he fell or after he fell and we got him back up on the chair but it was right into that time frame there.

Q   You said you had kept him on the floor for a while I guess that's why I'm asking in terms of time.   I think you testified you got there at what, 4:15?

A   What I'm saying—No, I'm guessing from 4:15—How I picked that time, I looked at the report and the rights were at 4:25.

Q   Okay.

A   I would have to look at my log at the station to tell you the exact time that the vehicle arrived.   I'm guessing 4:15 to 4:20.

Q   All right.   So approximately five to ten minutes before the time that you read Miranda rights?

A   Yes.

Q   The time that you read him Miranda rights did you ask him if he at that point wanted to make any statement to you?

A   Yes.

In addition, Officer Snook reaffirmed this sequence of events on cross-examination.   The officer stated that "when I got there the first thing I identified myself.   Explained to him

why I was there. I told him about the allegation of rape and that we did have an arrest warrant for him." *Id.* at 18. The officer then was asked, "He made the statement right at that point?" *Id.* Officer Snook replied affirmatively, stating, "Yes. As a matter of fact, I'm not sure I was in the door yet when he stated talking about it." *Id.*

█ It is axiomatic that a defendant's spontaneous statements not made in response to police conduct or questioning are not subject to suppression. *Commonwealth v. Odrick*, 410 Pa.Super. 245, 599 A.2d 974 (1991). In *Odrick*, the defendant confessed to a friend that he had stabbed his own sister and his sister's friend. The friend telephoned police, who immediately upon their arrival asked what had happened. The defendant confessed to the double killing. Police handcuffed the defendant but did not question him further. On the way to the police station, the defendant again blurted out that he had killed the two women.

The defendant argued that the statements he gave to police while he was handcuffed and in custody should have been suppressed since he had not been administered *Miranda* warnings. We disagreed, holding that the "statements made by appellant after he was handcuffed were not a result of custodial interrogation but instead were 'blurt outs' and thus were admissible despite the fact *Miranda* warnings were not given." *Id.*, 410 Pa.Super. at 249, 599 A.2d at 974.

Our decision in *Odrick* was premised upon *Commonwealth v. Yarris*, 519 Pa. 571, 549 A.2d 513 (1988). In *Yarris*, the defendant was in prison awaiting trial on pending charges when he volunteered to prison officials that he knew who had committed an unrelated crime, the rape and murder of a woman. Police investigated the individual who the defendant named and ascertained that it was impossible for that individual to have been at the crime scene. Police also discovered that the other individual had a sperm type different from that found in the victim. In the volunteered statements, the defendant also evidenced an extensive knowledge of the details

of the crime, some of which police had not made available to the public.

Our Supreme Court refused to suppress the statements which had been made without the administration of *Miranda* warnings. It ruled specifically that a defendant's volunteered statements, even if made in police custody, will not be suppressed as long as the police did not physically or verbally attempt to elicit incriminating statements from the defendant and as long as the statements were not the result of any discussions initiated by police.

*Yarris* and *Odrick* prevent the suppression of the statements at issue herein. The uncontroverted evidence was that Officer Snook approached appellee and informed him that he was being arrested for rape. Before the officer even had an opportunity to give the *Miranda* warnings, appellee blurted out that he had not raped the victim but that she had consented to sexual relations.

The trial court suppressed appellee's initial statement, made when police first arrived, based on its conclusion that appellee was in custody at the time that it was made. We do not take umbrage with the trial court's conclusion that appellee was in custody. However, as *Odrick* and *Yarris* clearly provide, the fact that a defendant is "in custody" is not the sole consideration. The statement was completely spontaneous, and police had not initiated discussions nor done anything, physically or verbally, to elicit a statement from him. Thus, the statement was not a result of interrogation and not suppressible due to a lack of *Miranda* warnings.

We acknowledge that the trial court concluded that police "initiated discussions" of the crime prior to the volunteered statement; however, this finding is without support in the record. The trial court made the following factual findings regarding this issue:

At the suppression hearing held on March 4, 1994, Trooper Snook testified that he arrived at the Defendant's residence at approximately 4:15 am., November 18, 1993. He noticed that no interior lights were on at the residence. When

Trooper Snook knocked on the door, the Defendant opened the door and Trooper Snook immediately informed the Defendant that he had a warrant for the Defendant's arrest *and proceeded to discuss the allegations which the step-grandaughter was asserting against Defendant* to which the Defendant replied, "I didn't rape her. She voluntarily came back and had sex with me. I can't believe this." (Trooper Snook quoting the Defendant's statement at the suppression). We find that the initial communications by Trooper Snook to the Defendant led to the Defendant' stating that he had engaged in consensual sex with the victim. Approximately five minutes later, *Miranda* warnings were read at approximately 4:25 A.M.

Trial court opinion, 5/17/94, at 1–2 (emphasis added). The underlined factual finding simply is not supported by the record.

Officer Snook's testimony was that he informed appellee that the officer was executing a warrant to arrest him for the rape of the victim. Before Officer Snook could say anything else, appellee became agitated and blurted out that the sex had been consensual. Officer Snook did not even ask appellee what had happened, as the officers had in *Odrick*. When appellee became ill, he was moved to the kitchen. Officer Snook made sure that appellee was better, called appellee's daughter, administered *Miranda* warnings, and *then* started to discuss the allegations. Appellee waived *Miranda* rights prior to offering his second statement, which was in conformity with his first.

As the Commonwealth aptly observes, the suppression rule is designed to punish unconstitutional police behavior. Police here did nothing wrong by first informing appellee that they had a warrant for his arrest and that he was accused of rape. Appellee faults police for not interrupting his initial blurt out statement to administer the warnings. However, there is no indication that police could have interrupted him. Appellee immediately denied raping the victim and said that the sexual intercourse was voluntary. These are short, spontaneous

utterances. This was not the beginning of a lengthy discussion which could be interrupted.

The knock and announce rule requires police who are executing a warrant immediately to inform a defendant of their identity, authority, and purpose. Pa.R.Crim.P. 2007. Therefore, Officer Snook legally was required first to inform appellee that the officer was executing a warrant for his arrest on charges of rape. Police cannot simultaneously administer *Miranda* warnings and comply with the knock and announce rule. Herein, there is no indication that Officer Snook purposefully delayed informing appellee of his *Miranda* rights in order to elicit incriminating statements. As appellee's initial statements did not result from any conduct, verbal or physical, by police and did not result from the initiation by police of a discussion of the crime, they were suppressed improperly. Since appellee's initial statements were not obtained unconstitutionally, the second statement, given after *Miranda* warnings and a waiver thereof, also was suppressed improperly.

Order reversed and case remanded.